# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

NORMA J. MAXWELL,                    )
                                     )
            Plaintiff,               )     No. 03:12-cv-00475-HU
                                     )
vs.                                  )
                                     )
CAROLYN W. COLVIN[1],                )   **FINDINGS AND RECOMMENDATION**
Commissioner of Social Security,     )
                                     )
            Defendant.               )
                     _____

Richard F. McGinty
McGinty & Belcher
P.O. Box 12806
Salem, OR 97301

        Attorney for Plaintiff

S. Amanda Marshall
United States Attorney
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2904

David Morado
Regional Chief Counsel, Region X, Seattle
Leisa A. Wolf
Special Assistant United States Attorney
Office of the General Counsel
701 Fifth Avenue, Suite #2900 M/S 221A
Seattle, WA 98104-7075

        Attorneys for Defendant

---

[1]Carolyn W. Colvin became acting Commissioner of Social Security on February 24, 2013. Therefore, pursuant to Federal Rule of Civil Procedure 25(d), she is automatically substituted for Michael J. Astrue as Defendant in this case.

1 - FINDINGS & RECOMMENDATION

HUBEL, United States Magistrate Judge:

The plaintiff Norma J. Maxwell (also called Norma Jean Smith in some of the medical records) seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Commissioner's final decision denying her applications for Disability Insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and Supplemental Security Income under Title XVI of the Act. Maxwell argues the Administrative Law Judge ("ALJ") erred in failing to develop the Record properly, failing to consider all of the evidence, and finding Maxwell is able to work. *See* Dkt. # 14.

### I.   PROCEDURAL BACKGROUND

Maxwell protectively filed her applications for DI and SSI benefits on January 7, 2008, at age 52, claiming disability since December 31, 2001, due to anxiety, back pain, memory problems, and a "learning impairment." (A.R. 10, 13, 111-15, 128[2]) Maxwell's applications were denied initially and on reconsideration. (A.R. 52-60, 64-70) Maxwell requested a hearing, and a hearing was held on October 21, 2010, before an ALJ. Maxwell appeared *pro se* at the hearing. She testified on her own behalf, and a Vocational Expert ("VE") also testified at the hearing. (A.R. 24-47) On December 9,

---

[2]The administrative record ("A.R.") was filed electronically using the court's CM/ECF system. Dkt. #11 and attachments. Pages of the A.R. contain at least three separate page numbers: two located at the top of the page, consisting of the CM/ECF number (e.g., Dkt. #11-3, Page 16 of 48) and a Page ID#; and a page number located at the lower right corner of the page, representing the numbering inserted by the Agency. Some pages also contain a page number inserted by the office supplying the records. Citations herein to "A.R." refer to the agency numbering in the lower right corner of each page.

2 - FINDINGS & RECOMMENDATION

2010, the ALJ issued his decision, denying Maxwell's applications for benefits. (A.R. 10-19) Maxwell appealed the ALJ's decision, and on February 28, 2012, the Appeals Council denied her request for review (A.R. 1-5), making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. Maxwell filed a timely Complaint in this court seeking judicial review of the Commissioner's final decision denying her applications for DI and SSI benefits. Dkt. #2. The matter is fully briefed, and the undersigned submits the following findings and recommended disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

## II. FACTUAL BACKGROUND

### A. Summary of the Medical Evidence

On February 20, 2002, Maxwell saw family practitioner Cynthia Caraballo, M.D. at Providence Medical Group/Newberg ("Providence") for a complaint of night sweats. Notes indicate Maxwell had a history of alcohol abuse, and had drunk most recently the previous evening. Maxwell had been in a physically abusive relationship, but currently was "safe," and living with her mother. Her night sweats were thought to be "[]possible early menopausal changes." She was diagnosed with PTSD "secondary to severe domestic violence and trauma," and was referred to a domestic violence counselor. Various lab tests were ordered to evaluate Maxwell's condition. (A.R. 224-26, 229-32)

Maxwell saw Dr. Caraballo for followup on March 13, 2002. Maxwell reported that her hot flashes were "improving with herbs." (A.R. 222) She had a normal gynecological exam, and was directed

to return for followup in one year. She also was advised to stop smoking. (A.R. 222-23, 227-28)

The next evidence in the Record of any type of medical care is more than three years later, on November 3, 2005, when Maxwell saw family practitioner Eleanor Sims, M.D. at the Virginia Garcia Memorial Health Center ("VGMHC"), for complaints of difficulty sleeping, and feeling "sad most of the time with crying episodes." (A.R. 290) Maxwell stated she felt very anxious when she went out in public. Her energy level was low, and she was waking up multiple times each night. She was diagnosed with depression, and the doctor prescribed the antidepressant Celexa. (*Id.*) There are no followup notes until fourteen months later, when Maxwell saw Dr. Sims on January 25, 2007. Maxwell was tearful and complained of difficulty sleeping. The doctor prescribed "generic Wellbutrin" for depression and anxiety. (A.R. 287-88)

Maxwell was seen in the ER on June 11, 2007, for right-sided back pain, with followup by family practitioner Andrew Mendenhall, M.D. at Providence on June 15, 2007. He prescribed methocarbamol (used "as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions"[3]), and salsalate (NSAID used to treat arthritis and related rheumatic disorders). On June 19, 2007, she was switched to Flexeril (a muscle relaxer). (A.R. 218; 221-23)

On June 29, 2007, Maxwell saw Certified Medical Assistant (CMA) Becky Bangle at Providence for followup. Maxwell stated her pain was "9 out of 10 intensity all the time." (*Id.*) She stated

---

[3]Medication information in this opinion is taken from RxList-The Internet Drug Index, www.rxlist.com.

4 - FINDINGS & RECOMMENDATION

her pain improved somewhat with a "hot bath and with dose of her husband's Oxycontin [oxycodone] 5 mg." (*Id.*) Maxwell stated naproxen made her nauseous, and her muscle relaxant medications were not helping. She described the pain as mostly in her right flank, but radiating up to her upper right back, and down to her right lumbar region. (*Id.*) Notes indicate Maxwell was 5'6" tall, and weighed 155.4 pounds. She smoked cigarettes, and was "not ready to quit." (*Id.*) Bangle noted Maxwell appeared to be uncomfortable lying on her left side on the exam table. Spasms were observed on her right side, and she exhibited "[h]unched shoulders with head forwards[.]" (A.R. 219) She had decreased lumbar extension due to pain, but other ranges of motion were normal. Bangle also noted Maxwell was "depressed." (*Id.*) Bangle administered an injection of Toradol for pain relief, and directed Maxwell to continue taking her Flexeril and salsalate, and use heat and massage. Maxwell was given a handout on a home exercise program. (A.R. 220) Bangle's treatment notes were reviewed and approved by David Silvestre, M.D. (*Id.*)

On November 21, 2007, Maxwell was admitted to a residential treatment program for chemical dependency at Hazelden, to address Maxwell's use of her husband's oxycodone pills, and addiction to marijuana. (A.R. 233; *see* A.R. 233-60) Maxwell reportedly had "been working with her husband and pastor to find the appropriate treatment for her chemical dependency," resulting in her admission to Hazelden. (A.R. 233) In discussing her current medical history, Maxwell stated she suffered from chronic back pain, which she believed may have stemmed from a 1977 whiplash injury in an auto accident. She had "lost clarity regarding her back pain, as

5 - FINDINGS & RECOMMENDATION

1  to whether it [was] legitimate back pain or [was] due to her
2  addiction." (A.R. 243) Maxwell had tried muscle relaxants "just
3  once earlier this spring," but felt the medications were not
4  helpful and too expensive. (A.R. 233) She currently was taking
5  400 mg to 800 mg of Ibuprofen two to three times daily for
6  "adequate management." (*Id.*) Her admission diagnoses were history
7  of substance use, opiate withdrawal, chronic back pain, and cough.
8  (A.R. 235) Her current GAF was estimated at 40, indicating "some
9  impairment in reality testing or communication, or major impairment
10 in several areas such as work or school, family relations, judg-
11 ment, thinking, or mood." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217
12 n.3 (9th Cir. 2005) (citing Am. Psychiatric Ass'n, *Diagnostic &*
13 *Statistical Manual of Mental Disorders* 34 (4th T.R. ed. 2000)).

14     Maxwell stated her drug of choice was oxycodone, or other
15 opiates. She reported "taking 5 milligram tablets, four or more in
16 a day, up to a total of seven per day," for the past year, with her
17 last use the day before her admission. (*Id.*) She reported taking
18 "two to three puffs a night" of marijuana, about five nights per
19 week. She used to drink five to six beers per day, but stated she
20 really did not like alcohol, and her last drink was about a year
21 before her admission. (*Id.*) An intake counselor opined that
22 Maxwell had "a very simple and naive approach to what recovery is
23 and believe[d] treatment [would] mean the end of her addiction."
24 (A.R. 243) The counselor noted Maxwell was "naive and manipulative
25 but [did] not appear malicious." (*Id.*) Maxwell reported smoking
26 about a pack of cigarettes a day, and was "interested in
27 cessation." (A.R. 234) She currently was a housewife, but stated
28 she previously had worked as a grocery employee. (*Id.*) During her

6 - FINDINGS & RECOMMENDATION

psychological evaluation, Maxwell stated "her last job was working in an electronic assembly plant in Newburg," a job she lost "in June 2007 due to her difficulties mastering soldering skills after having taken a class in it." (A.R. 244) She further stated it was "sort of a relief" when she lost her job because she had been having problems working due to her back pain. (*Id.*)

For her back pain, Maxwell was started on methocarbamol 500 mg., one to two three times daily, and Ibuprofen 500 mg. three times daily. She was referred to the "Chronic Pain Group and biofeedback," and was instructed to use heating pads. (A.R. 235)

Lab tests indicated Maxwell had an "[i]mpaired glucose tolerance," with her fasting glucose of 130 "just at the level of diabetes vs. pre-diabetes." (A.R. 237)

Maxwell "went to the Chronic Pain Group" on November 27, 2007, and reported "feeling overwhelmed with pain." (A.R. 238) She stated her pain level was 5 out of 10, and was "the same pain that caused her to start using." (*Id.*) She described daily pain that focused in different areas of her back, and she indicated the pain was "becoming 'exhausting.'" (*Id.*) Her Ibuprofen was increased to 600 mg. three times daily. In addition, she was started on Chantix for smoking cessation. (*Id.*)

Psychological testing on November 27, 2007 (*see* A.R. 244-46), suggested Maxwell has "low average functioning in the verbal area," and "below average functioning" in abstraction; "a borderline level of clinical depression"; no anxiety or social phobia symptoms; and "a mild level of obsessive-compulsive symptoms." (A.R. 245) Her performance on the MMPI-2 suggested "difficulties with thinking and concentration," and the likely presence of "significant psycho-

7 - FINDINGS & RECOMMENDATION

logical distress, despite [her] attempts to deny or repress problems." (*Id.*) The clinician noted typical symptoms for someone with Maxwell's psychological profile include "significant depression, as well as lowered activity level, apathy and helplessness. They are over-controlled and have difficulty expressing their feelings and tend to be dependent in relation-ships. They often grow accustomed to their chronic problems and continue to function at lowered levels of efficiency for long periods of time. Physical complaints, often with a histrionic quality, are likely." (*Id.*) Maxwell's diagnoses from the psycho-logical evaluation were chemical dependency, and dysthymic disorder. (A.R. 246) Her current GAF was estimated at 46, which is consistent with a person having "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Morgan v. Comm'r*, 169 F.3d 595, 598 n.1 (9th Cir. 1999).

On December 12, 2007, Maxwell met with a Nurse Practitioner "to discuss her medical discharge" from Hazelden. (A.R. 240) Maxwell was informed that test results were positive for Hepatitis C. She was encouraged to obtain genotyping and viral load, and they discussed management of the disease. She also was encouraged to get re-tested for diabetes in a few months. Maxwell was "very tearful when reflecting on what these diagnoses mean[t]." She was directed to follow up with a primary care provider in about a month. (*Id.; see* A.R. 253-54)

Maxwell was seen for an initial psychiatric assessment at Hazelden on December 17, 2007, apparently in preparation for

8 - FINDINGS & RECOMMENDATION

entering into extended day treatment. (*See* A.R. 257, 260) Her affect was noted to "range[] from mainly sad to euthymic." (A.R. 248) She was relaxed, not overly anxious or agitated, and had fairly good insight and judgment. She was noted to be "highly motivated and hopeful about her first residential treatment." (*Id.*) Although she described periods of mild depression, the psychiatrist believed these could be "addressed with the tools from recovery and other nonmedication interventions." (A.R. 249) Maxwell's diagnoses mirrored those from her psychological evaluation; i.e., substance abuse and dysthymic disorder. Her current GAF was estimated at 50 (*id.*), continuing to indicate serious symptoms. *See McFarland v. Astrue*, 288 Fed. Appx. 357, 369 (9th Cir. 2008) (unpublished)[4]; *Morgan, supra*.

Maxwell was discharged from Hazelden's residential program on December 18, 2007. Her GAF at discharge was estimated at 46, continuing to indicate serious symptoms. *Id.* She was advised to attend daily 12-Step meetings and get a Sponsor; participate in the Day Treatment program; and see the Hazelden psychologist weekly while in the treatment program. (A.R. 257; *see* A.R. 255-57)

On December 21, 2007, Maxwell was contacted by Hazelden staff. Maxwell "reported that she did not want to attend Extended Day Care Day Treatment. She was encouraged to reconsider this plan and talk about the pros and cons of attending, [but] she continued to report that she did not want to attend. She [felt] like she [had] enough recovery support through her church and the Celebrate Recovery

---

[4]Unpublished Ninth Circuit cases referenced in this opinion are cited pursuant to Ninth Circuit Rule 36-3. *See* Fed. R. App. P. 32.1(a).

9 - FINDINGS & RECOMMENDATION

program and that she [would] go to meetings daily." (A.R. 260)  As a result, Maxwell was discharged from the Extended Care Day Treatment program "as of 12/24/07." (*Id.*)

On April 14, 2008, Neal E. Berner, M.D., a Family Practice specialist, provided a "Physical Summary" and opinion in connection with Maxwell's applications for disability benefits.  He found Maxwell's "statements [were] not fully consistent." (A.R. 261) Dr. Berner noted that although Maxwell claims she has nearly constant back pain, objective findings have not revealed any weakness, loss of sensation, or loss of motion, and her pain "[i]mproves with hot bath and husband's Oxycontin." (*Id.*)  He further noted Maxwell's back pain increases "when she thinks or talks about her prior abuse," and her "MMPI profile [is] consistent with physical complaints of histrionic quality." (*Id.*)  He there-fore found Maxwell's physical complaints to be nonsevere. (*Id.*)

Also on April 14, 2008, clinical psychologist Dorothy Anderson, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (A.R. 262-75), and a Mental Residual Functional Capacity Assessment form (A.R. 276-79) regarding Maxwell.  Like Dr. Berner, Dr. Andersen found Maxwell's statements regarding her limitations were not fully consistent.  She noted that although Maxwell reported difficulties remembering informa-tion, her mental status examinations failed to show any problems with memory or concentration, and she was able to complete testing and questionnaires. (A.R. 274)  Dr. Anderson opined Maxwell would be able to understand and remember "simple/routine instructions/ procedures," but she indicated "[d]eficits in concentration [would] limit [Maxwell's] ability to retain more complex instructions."

10 - FINDINGS & RECOMMENDATION

1   (A.R. 278)  She opined Maxwell could "sustain attention to complete
2   simple/routine tasks consistently," but she would need a "routine
3   work setting that does not change frequently or rapidly[,]" and due
4   to Maxwell's drug use, she should avoid hazards and heights.  (*Id.*)
5   Dr. Anderson noted Maxwell's "[t]endency to focus on back pain
6   limits [her] ability to interact with [the] general public.  [She]
7   [c]an interact when the setting is structured and does not require
8   quick problem solving of more complex tasks.  [She] [c]an be
9   socially appropriate with coworkers/supervisors."  (*Id.*)

10      On May 13, 2008, Maxwell saw a Physician's Assistant at
11  Dr. Sims's office for followup of "chronic back pain, depression,
12  and family stress."  (A.R. 286)  Maxwell was concerned about her
13  recent diagnoses of Hepatitis C and prediabetes.  Notes indicate
14  Maxwell's back pain was "managed with NSAIDs."  (*Id.*)  The P.A.
15  suggested Maxwell try an antidepressant for her depression and
16  anxiety, but Maxwell declined the medication.  (*Id.*)

17      On May 27, 2008, Maxwell called the VGMHC with a complaint of
18  nausea.  She stated she had received Tramadol from internal medi-
19  cine specialist Dr. Robert A. Senft on May 20, 2008 (*see* A.R. 285),
20  but by May 25, 2008, the medication had made her nauseous, and now,
21  the medication was not strong enough to help her back pain.
22  Maxwell stated she had taken 1600 mg. of Ibuprofen in the morning
23  for pain.  Dr. Senft advised her that the highest recommended
24  dosage of Ibuprofen is 800 mg., and if Maxwell began having any
25  abnormal symptoms, she should go to the ER immediately.  Notes
26  indicate Maxwell's chart would be given "to provider" with
27  Maxwell's request for new pain medication.  (A.R. 283)

28

11 - FINDINGS & RECOMMENDATION

On May 29, 2008, Maxwell called the VGMHC, reporting that she had been waiting for Dr. Senft to call and change her prescription from Tramadol "to something stronger." (A.R. 282) The doctor noted that due to Maxwell's history of chemical dependency, he did not recommend narcotic pain medications. He advised that Maxwell could take a combination of Ibuprofen, Tylenol, and Tramadol for pain control, but not to exceed the maximum recommended dosages of any medication. (A.R. 284)

On June 5, 2008, Maxwell saw Dr. Sims for a complaint of chronic back pain. Dr. Sims noted Maxwell was a "very poor historian regarding [her] back pain." (A.R. 280) Maxwell requested a prescription for Tramadol, which the doctor denied. (A.R. 280-81)

On July 9, 2008, Maxwell saw Dr. Sims for followup. She was referred to a specialist for evaluation of her Hepatitis C. Regarding her chronic lower back pain, Maxwell exhibited some tenderness of her back. She was directed to continue with her current medications. For her depression, Maxwell declined any medication and she was offered counseling. (A.R. 309)

Dr. Sims authored a letter dated July 15, 2008, regarding Maxwell's medical problems, stating as follows:

> Ms. Maxwell is currently being seen in our medical clinic for the following conditions:
>
> Chronic Low Back Pain with recent acute excacerbation [sic] and is on daily pain medications. She has had physical limitations due to this especially with lifting, bending and prolonged standing and sitting.
>
> Depression for which she has been recommended to undergo counseling sessions.

12 - FINDINGS & RECOMMENDATION

Hepatitis C.  She is being referred to the liver specialist for this.

(A.R. 293)

On September 3, 2008, Sharon B. Eder, M.D., an internal medicine specialist, reviewed the record and prepared a Physical Summary in connection with Maxwell's request for reconsideration. Dr. Eder noted Maxwell's Hepatitis C was not symptomatic, and no doctor had recommended treatment currently for Hepatitis C or diabetes.  She noted Maxwell complained of chronic lower back pain, but Maxwell was "noted to be [a] very poor historian," and she had no radiation to her lower extremities.  Dr. Eder recommended affirmation of the previous denial of benefits.  (A.R. 294)

On September 4, 2008, clinical psychologist Paul Rethinger, Ph.D. reviewed the record and prepared a Mental Summary in connection with Maxwell's request for reconsideration.  He also recommended the prior denial of benefits be affirmed.  (A.R. 295)

On February 2, 2009, seven months after her last visit, Maxwell saw a nurse in Dr. Sims's office for followup of her chronic back pain.  Maxwell stated her current pain medications (Naproxen and Flexeril) were not working.  Her pain continued to vary in intensity and location from day to day, with the primary pain located in her mid to upper back.  On examination, Maxwell had good ranges of motion and no deformities.  She exhibited minimal tenderness on the right side of her mid-back.  Maxwell also complained of depression, but stated she did not want to take an antidepressant due to previous "bad experience" with Wellbutrin and lorazepam.  The nurse noted Maxwell had a "somewhat flat affect." (A.R. 308)  Maxwell was diagnosed with chronic back pain with a

13 - FINDINGS & RECOMMENDATION

1   "psychosomatic component." (*Id.*)  She was started on Nortriptyline
2   and Vicodin (hydrocodone).  (*Id.*)

3       On March 4, 2009, x-rays were taken of Maxwell's lumbar spine.
4   Findings showed "[m]ild diskogenic and facet degenerative changes,"
5   with "[n]o fractures or dislocations . . . [or] foreign bodies."
6   (A.R. 324)

7       On March 25, 2009, Maxwell saw Dr. Sims for followup of her
8   chronic lower back pain.  The doctor prescribed Vicodin (hydroco-
9   done), one to two tablets twice daily as needed.  She directed
10  Maxwell to continue taking Nortriptyline, and indicated Maxwell
11  would have to see a nurse to sign a narcotic contract.  (A.R. 307)

12      Maxwell saw a nurse in Dr. Sims's office on May 5, 2009, for
13  purposes of executing a pain contract.  Maxwell stated she was
14  "missing some pills" after leaving her bottle of Vicodin on the
15  counter in the house, but she now was locking the medication in her
16  glove compartment.  (A.R. 306)  She stated she was taking two pills
17  twice daily as needed.  Maxwell was advised that her last prescrip-
18  tion stated it was to last for one month, but Maxwell stated she
19  only had two pills remaining.  She completed a medication history
20  and opioid risk assessment, and was deemed a "moderate risk" with
21  some problematic behavior.  Notes indicate the nurse would consult
22  with Dr. Sims regarding Maxwell's medication situation, with
23  Maxwell to follow up with the doctor.  (*Id.*)

24      Five months later, on October 12, 2009, Maxwell saw Dr. Sims
25  for followup of persistent, chronic upper back pain.  Notes indi-
26  cate Maxwell was on a "pain contract." (A.R. 305)  She had no back
27  deformity, radiculopathy, or joint involvement.  Maxwell indicated
28  she was "very frustrated" because she could not get rid of her

14 - FINDINGS & RECOMMENDATION

pain. Dr. Sims opined Maxwell might have fibromyalgia. She also ordered thoracic x-rays to rule out any vertebral abnormality. She started Maxwell on Cymbalta for depression. (*Id.*)

Prescription records from VGMHC show Maxwell was prescribed Naproxen 500 mg. on January 26, 2009, to be taken as needed. On March 17, 2009, she was prescribed Nortriptyline 25 mg., but this was discontinued almost immediately. She then was prescribed Vicodin, 2 pills twice daily, receiving refills of 112 tablets each on May 5, June 2 and 30, and July 7, 2009. The Vicodin was discontinued on October 15, 2009, when Dr. Sims prescribed Oxycodone 5 mg., one pill three times daily. On November 9, 2009, the dosage was increased to one pill four times daily, and this was refilled on December 7, 2009. In addition, Maxwell began taking Cymbalta on October 19, 2009, with a refill on November 9, 2009. (A.R. 302)

Maxwell saw Dr. Sims on March 23, 2010, to discuss her pain medications. Maxwell stated "her Oxycodone [had] been stolen from her purse." (A.R. 333) She brought in an empty pill bottle from a prescription filled on March 9, 2010. Maxwell stated she had "been needing 6 tabs a day this last month due to increasing pains." (*Id.*) (The record does not indicate any doctor approved this increased dosage.) She had been out of the medication for four days and was "feeling miserable." (*Id.*) Maxwell reported that her pain was now centered mostly in her neck area, with radiation to both upper arms and on-and-off tingling. She denied any upper extremity weakness. Maxwell was noted to be "[c]rying, saying she need[ed] her meds so she [could] work." (*Id.*) Objective examination revealed minimal spasm in her trapezius muscles.

15 - FINDINGS & RECOMMENDATION

The doctor ordered an MRI of Maxwell's cervical spine. She prescribed Flexeril, but noted the following regarding the narcotics:

> Declined to refill lost Oxycodone. Lengthy discussion about how she has broken her contract. Changing her dose without first discussing with her [primary care provider], and then claiming to have it stolen. I will give her another chance, seeing that she does have a job that she is able to hold if her pain is manageable but I warned her that she will need to follow the contract. I will not increase her dose. She can continue to take Oxycodone 5 mgs, 1-2 tabs [twice daily] in addition to Naproxen and [as needed] Flexeril. She will need to come for an appointment in 1 month.

(A.R. 334)

The MRI of Maxwell's cervical spine was done on March 26, 2010. Findings showed no obvious lesions or ligamentous injury. There was "a moderate degree of narrowing of the left neural foramen" at C3-4; "some mild bony eburnation along the posterior aspect of the[] vertebral bodies" at C4-5, with no stenosis and normal neural foramina; and "mild bony eburnation along the posterior aspect of the[] vertebral bodies" at C6-7, with "a small tear in the posterior disc annulus." (A.R. 342) (The Record contains only the first page of the MRI report.)

On August 23, 2010, five months after her MRI, Maxwell saw a nurse in Dr. Sims's office, requesting a refill of lorazepam. The nurse observed that notes from Maxwell's last office visit indicated lorazepam had been discontinued. She consulted with Dr. Sims's medical assistant, who informed her "Dr. Sims explicitly stated no more lorazepam for this patient." (A.R. 331) Maxwell

also stated she was out of oxycodone, and the nurse advised Maxwell she would have to consult with Dr. Sims. (*Id.*)

Maxwell saw Dr. Sims on September 1, 2010, for followup of her chronic back pain.  The doctor noted Maxwell had "been on Oxycodone for chronic back pains, which allowed her to be able to keep her job in a retail store.  She reports that she has been approved for disability and that she was let go from her job due to disagreements with the store owner." (A.R. 332) Maxwell felt the narcotics were "making her feel not normal so she flushed them down the toilet and now she feels jittery and nervous from withdrawals." (*Id.*)  She was taking NSAIDs, but still had some pain, at a level of 4 to 8 daily.  She also was "trying to exercise more since she lost her job." (*Id.*)  The doctor prescribed Ibuprofen 800 mg., one pill three times daily; Gabapentin 300 mg., increasing to one pill three times daily; and lorazepam .5 mg., one pill twice daily. (A.R. 332-33)

Maxwell saw Dr. Sims the next day[5] for "persistent anxiety issues." (A.R. 330)  Notes indicate Maxwell "[s]truggles with chronic pain issues and insomnia, although reports that has been doing better on Ibuprofen.  This is contradictory to her visit yesterday when she was asking for [refill] of both Lorazepam and Oxycodone." (*Id.*)  Maxwell denied being depressed.  The doctor prescribed a trial of Buspirone for anxiety.  She also ordered a nerve conduction study due to Maxwell's complaint of "numbness and

_____

[5]The content of the progress notes from this visit indicate it was the day after Maxwell's previous visit, although these notes also are dated 9/10/10.  *Compare* A.R. 330 *with* A.R. 332.

17 - FINDINGS & RECOMMENDATION

pain [in] both hands for years" (noting this was "the first time she ha[d] mentioned this."). (*Id.*)

On September 30, 2010, Maxwell saw Dr. Sims for followup of her chronic neck and lower back pain "due to arthritic and disc changes." (A.R. 329)  Notes indicate Maxwell had decided to try being off of narcotics, but she had "been struggling with her pains," and "would like to be given another chance." (*Id.*) Examination revealed mild paravertebral spasms and mild neck spasms.  The doctor prescribed a two-week trial of Oxycodone 5 mg, two tablets twice daily, and Cymbalta 60 mg., one pill twice daily. She ordered a drug screen panel. (*Id.*)

On October 6, 2010, Maxwell saw Dr. Sims to discuss Maxwell's urinalysis findings, which were positive for THC.  Maxwell denied smoking marijuana, but stated she "may have been eating brownies that her exhusband admitted were laced with THC." (A.R. 327) Maxwell was "[c]rying[,] claiming that she cannot function without her Oxycodone.  She is starting work next week and she is in pain all day." (*Id.*)  She was diagnosed with chronic pain syndrome. The doctor indicated she would "give [Maxwell] another chance," with more frequent urine tests.  If the tests were negative, then the doctor would restart the Oxycodone. (*Id.*)

Maxwell underwent a nerve conduction study on October 7, 2010. The test revealed no evidence of carpal tunnel syndrome. (A.R. 335)

/ / /

/ / /

/ / /

/ / /

18 - FINDINGS & RECOMMENDATION

### B.  Maxwell's Testimony

### 1.  Hearing testimony

At the outset, the ALJ explained to Maxwell that if she wanted to postpone the hearing so she could seek legal representation, the hearing would be rescheduled.   Maxwell indicated she wanted to proceed with the hearing.  (A.R. 26-28)

At the time of the hearing, Maxwell was 55 years old.   She finished the tenth grade in school, and did not get a GED.  (A.R. 32)  In the past, Maxwell worked in an electronics assembly job for a company she described as "building parts for like remote control TVs and stuff like that."  (A.R. 33; *see* A.R. 244)   The job required her to stand and do "a lot of walking," but did not require any lifting.  (*Id.*)  She also worked, in the late 1970s or early 1980s, as a raw fish packer for a seafood company and for a fishery.  (A.R. 41-42)[6]

The ALJ noted Maxwell's medical records include records from inpatient substance abuse treatment.   Maxwell indicated she no longer uses alcohol or any other drug except for prescribed medications.  (*Id.*)

Maxwell stated she lives alone in a one-bedroom apartment. According to her, some type of social welfare organization called "White Cap" assisted her with rent and utilities for her apartment, and a case worker from the organization gave Maxwell a ride to the ALJ hearing.  (A.R. 28, 35)   Maxwell gets health care assistance

---

[6]Although the ALJ did not elicit testimony about Maxwell's most recent position, it appears she worked as a checker at a grocery store.  *See* A.R. 43, the VE's description of Maxwell's past relevant work; *see also* A.R. 234.

"through senior disability services in McMinnville," and she also gets food stamps. (A.R. 36)

Maxwell does her own grocery shopping. She walks to the grocery store, which is close to her apartment. She does not attend AA meetings frequently "because it's just a circus." (A.R. 36) She attends church services, but does not participate in other activities. (*Id.*) She gets along with her seven brothers, but as far as getting along with members of the public, Maxwell stated she keeps to herself and does not socialize. She likes to grow house plants in small pots, and she reads the Bible. She occasionally visits her mother if one of her brothers picks her up and takes her. (A.R. 37) Although Maxwell is married, she and her husband are separated, and she has no contact with him. (*Id.*)

Maxwell stated the primary reason she is unable to work is back pain. She indicated Dr. Sims has told her "it's fibromyalgia," and she also has "issues with depression." (A.R. 38) Maxwell stated her problems are equally physical and mental. (*Id.*) The ALJ noted Dr. Sims's indication that Maxwell has diabetes mellitus type II. Maxwell stated she is not on any medication for diabetes, and Dr. Sims has advised her to "work on losing 10 pounds." (A.R. 39)

The ALJ indicated records from Dr. Sims ended in September 2009, so he would obtain updated records from Dr. Sims. (A.R. 38-39) He had Maxwell sign a medical authorization for that purpose. (A.R. 46)

/ / /

/ / /

/ / /

*2. **Written testimony***

Maxwell completed a Function Report - Adult on January 30, 2008.  (A.R. 157-64)  She described her daily activities as follows: "Wake up.  Daily reading.  Bath.  Let dogs out.  Read some more.  Most days just be at home."  (A.R. 157)  She indicated she and her husband "help take care of each other."  (A.R. 158)  She cooks and washes dishes, spending about an hour-and-a-half daily on household work.  (A.R. 158, 159)  She gives the dogs food and water, and lets them outdoors as necessary.  She indicated "they are little dogs 7-10 lbs. each."  (A.R. 158)  She prepares food daily, heating up "soups from [a] can," and sometimes making sandwiches or stews.  She stated these activities take her longer than they used to because she has "low energy" and "pain in [the] side of [her] back."  (A.R. 159)

Maxwell stated, "Some nights sleeping is a struggle.  Pain is the reason."  (A.R. 158)  She indicated she used to be more active than she is able to be currently.  (*Id.*)  She has no problems with her personal care, and needs no reminders to take her medications.  When she goes out, her husband usually goes with her.  Although she knows how to drive, she indicated, "When I drive I feel a lot of pain in the side of my back/get nervoues [sic]/ feel unsure."  (A.R. 160)  She goes grocery shopping once a week, buying small amounts at a time.  She can handle money, but indicated balancing a checkbook is "a struggle."  (*Id.*)

Maxwell indicated she attends a 12-Step meeting about once a week, but "sitting long periods at a time cause[s] pain."  (A.R. 161)  She prefers to have someone accompany her to the meetings. She stated she had noticed increasing pain, anxiety, and nervous-

21 - FINDINGS & RECOMMENDATION

ness over the past three years.  (*Id.*)  About twice a week, she talks with her mother and friends on the phone.  (*Id.*)  She has some problem getting along with her family because they disapprove of her marriage.  (A.R. 162)  She stated that due to her condition, she is "not active," doing only "what needs done."  (A.R. 162)

Maxwell indicated her condition causes her problems with lifting, sitting, concentrating, understanding, and following instructions.  She will not lift more than ten pounds.  After sitting for about an hour, she needs to stand and walk around.  She can only concentrate for short periods.  She has difficulty understanding "some issues," and following instructions is "a struggle."  (*Id.*)  She can walk short distances, and then rests when she gets home.  She can follow a recipe, but following written instructions at a workplace is "a struggle," and following detailed, spoken instructions is difficult for her.  (*Id.*)  She stated she was fired from her last job due to her inability to learn to solder, rather than from any problem getting along with people.  (A.R. 163)  Stress causes her "a lot of discomfort."  (*Id.*)  She is "OK with change," and she has some difficulty with learning.  (*Id.*)

### C.  Third-Party Testimony

Maxwell's husband Jack D. Maxwell, Jr. ("Jack") completed a third-party function report regarding Maxwell on January 29, 2008.  (A.R. 149-56)  He indicated Maxwell complains of pain daily.  She helps him with his "sickness," and they "help take care of each other, . . . get[ting] through the day the best [they] can."  (A.R.

149-50)  Maxwell helps feed their two dogs.  Their daughters and church members help them with "anything they can."  (A.R. 150)

Jack indicated Maxwell sometimes is unable to sleep due to pain.  He indicated she has no problems with her personal care, and needs no reminders to take her medications.  (A.R. 150-51)  According to Jack, Maxwell prepares food daily, making "easy meals," but it takes her longer than it used to.  He indicated Maxwell can do house cleaning chores, and "some laundry," but these tasks also take her longer than they used to.  (A.R. 151)

When Maxwell goes out, her husband generally goes with her. Maxwell shops for groceries weekly.  She can handle money without assistance.  She goes to church weekly, occasionally attends a 12-Step meeting, and watches television.  (A.R. 152-53)  In Jack's opinion, Maxwell can follow written and spoken instructions, and she generally finishes what she starts.  (A.R. 154)  He indicated all of Maxwell's physical and mental functional abilities are affected by her condition, but he provided no explanation for this opinion, simply checking all of the available boxes on the form. (*Id.*)  He indicated Maxwell handles changes in routine "OK," and she has a lot of stress but he does not know how well she handles it.  (A.R. 155)

### D.  Vocational Expert's Testimony

Before questioning the VE, the ALJ explained to Maxwell about the type of information the VE would provide:

> [E]verybody's jobs are described by the Department of Labor and there's three main parts to each job.  One is a title, the second is what kind of physical requirement does it have as far as lifting, standing, carrying,

23 - FINDINGS & RECOMMENDATION

> and you'll hear things called light or medium
> or sedentary; and a third is what kind of
> training or experience does it take to learn
> to do a job or the doing. That's called a
> skill level and that's converted into a
> number, two, three, four.

(A.R. 40-41)

The VE described Maxwell's past relevant work as "[c]ashier checker," a semi-skilled job classified as "light work per the [Dictionary of Occupational Titles, or DOT]," with an SVP of 3[7]; and electronics assembler, a semi-skilled, light job with an SVP of 4. (A.R. 43)

The ALJ asked the VE to consider an individual of Maxwell's age, with her education and work experience, and the following "non-exertional limitations":

> Limiting to simple, routine instructions and
> procedures. There's some limitation in inter-
> acting with the general public and that should
> be . . . in a structured setting and not
> requiring quick problem solving. So basically
> it would be . . . brief interaction and that's
> about it with no public service job as such
> like sales, for example. Probably the cashier
> job would exceed that I'm assuming. And needs
> a routine work setting that doesn't change
> frequently or rapidly so pretty much . . . set
> routine. It looks like the first job would
> probably be precluded based on that I would
> guess.

---

[7]Jobs are classified with an "SVP," indicating the level of "specific vocational preparation" required to perform the job, according to the *Dictionary of Occupational Titles*. The SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Davis v. Astrue*, slip op., 2011 WL 6152870, at *9 n.7 (D. Or. Dec. 7, 2011) (Simon, J.) (citation omitted). "The DOT identifies jobs with an SVP level of 1 or 2 as unskilled, jobs with an SVP of 3 or 4 as semi-skilled, and jobs with an SVP of 5 or higher as skilled." *Whitney v. Astrue*, slip op., 2012 WL 712985, at 3 (D. Or Mar. 1, 2012) (Brown, J.) (citing SSR 00-4p).

24 - FINDINGS & RECOMMENDATION

(A.R. 43-44)  The VE agreed the hypothetical individual could not perform the grocery store cashier/checker job.  (A.R. 44)

     With regard to the electronics assembler job, the VE indicated that with an SVP of 4, the job is semi-skilled, and probably would be beyond the hypothetical individual's limitation to simple, routine work.  (*Id.*)  The VE noted the DOT was last updated in 1989.  The VE provided some opinion testimony related to "more recent Department of Labor publications in the last couple years"; however, the VE's testimony contains several "(INAUDIBLE)" notations that make it impossible to determine what point the VE was making regarding the more recent publications.  (A.R. 44)  The ALJ responded, "Well, let's assume that, I always consider the alternatives.  Any other occupations around the (INAUDIBLE)?"  It appears the VE's testimony that followed was regarding other jobs the hypothetical individual could perform that exist in significant quantities in the regional and national economies.[8]

     The VE listed the following jobs: "cleaner, commercial, institutional, . . . heavy work, SVP: 2, unskilled"; "laundry laborer . . . medium work, SVP: 2, unskilled"; and "packager, hand, . . . medium work, SVP: 2, unskilled."  (A.R. 44-45)  Considering only jobs classified as "light work," the VE listed the following: "assembly, machine tender, . . . SVP: 2, unskilled"; "office helper . . . SVP: 2, unskilled"; and "cleaner, housekeeping, . . . SVP: 2, unskilled."  (A.R. 45)

--------

[8]The ALJ indicated the VE testified Maxwell could perform her past relevant work as an electronics assembler "as described in more recent publications, . . . which describe the job as normally performed after no more than 30 days of on-the-job training, or SVP 2."  (A.R. 17)

25 - FINDINGS & RECOMMENDATION

The ALJ clarified with Maxwell that she feels unable to do a "typical job" requiring "somewhere between 35 and 40 hours a week, five days a week or 10 hours a day for four days a week, . . . full time job." (*Id.*)

### III.   DISABILITY DETERMINATION AND THE BURDEN OF PROOF

#### A.   Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520). The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)).  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet

26 - FINDINGS & RECOMMENDATION

the burden at any of those four steps, then the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's subjective symptom testimony, the ALJ must engage in a two-step analysis. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Under the first step prescribed by *Smolen*, . . . the claimant must produce objective medical evidence of underlying "impairment," and must show that the impairment, or a combination of impairments, "could reasonably be expected to produce pain or other symptoms." *Id*. at 1281-82. If this . . . test is satisfied, and if the ALJ's credibility analysis of the claimant's testimony shows no malingering,

27 - FINDINGS & RECOMMENDATION

> then the ALJ may reject the claimant's testi-
> mony about severity of symptoms [only] with
> "specific findings stating clear and con-
> vincing reasons for doing so." *Id.* at 1284.

*Batson v. Commissioner*, 359 F.3d 1190, 1196 (9th Cir. 2004).

### B.  The ALJ's Decision

The ALJ noted Maxwell's date last insured for purposes of the Social Security Act's requirements is December 31, 2007. (A.R. 12) He noted Maxwell has had some work activity since that date, with evidence suggesting she "may have earned over substantial amounts during part of the relevant period[.]" (*Id.*)  Nevertheless, the ALJ gave Maxwell "the benefit of the doubt," finding she has not engaged in substantial gainful activity since her date last insured. (A.R. 12-13)

The ALJ made no finding of severity with regard to Maxwell's chronic back pain.  He found Maxwell has severe impairments consisting of "dysthymic disorder, anxiety disorder NOS, and polysubstance abuse disorder in remission." (A.R. 13) However, he further found these impairments, singly or in combination, do not meet the Listing level of severity.  He found Maxwell has only mild difficulties in social functioning; no restriction in her activities of daily living; moderate difficulties with regard to concentration, persistence, or pace; and no episodes of decompensa-tion of extended duration. (*Id.*) After considering the "paragraph B" and "paragraph C" criteria (*see* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A), describing the "paragraph B" and "paragraph C" criteria), the ALJ concluded Maxwell has the following residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: [she] can under-stand and remember simple, routine instruc-tions and procedures, can sustain concentra-tion and attention to complete simple, routine tasks consistently, can sustain limited inter-action with the general public, can interact in a structured setting that does not require quick problem-solving, needs a routine work setting that does not change rapidly, and should avoid hazards and heights due to drug use.

(A.R. 14)  The ALJ found that with this RFC, Maxwell "is capable of performing [her] past relevant work as an electronics assembler," which the ALJ recognized as light, semi-skilled work, with an SVP of 4.  (A.R. 17)  Alternatively, based on the VE's testimony, the ALJ further found Maxwell is able to perform other jobs that exist in the national economy, including "cleaner, commercial, institu-tional," and "packager, hand," each of which has an SVP of 2. (A.R. 18)  In making these findings, the ALJ held that although Maxwell's medically-determinable impairments could cause some of the symptoms she alleges, Maxwell's and her ex-husband's statements concerning "the intensity, persistence and limiting effects of these symptoms" were not fully credible.  (A.R. 15)

In support of his credibility finding, the ALJ noted the following:

- In January 2008, when Maxwell and her husband applied for disability benefits, the field office noted Maxwell "smelled of alcohol." Although Maxwell disputed that observation, she later stated she had "started a 12-step program in January 2008." (A.R. 14)

- Maxwell "cooks, washes dishes (for up to 90 minutes daily), takes care of her dogs, and has no problems with personal care. She asserted that she can lift 10 pounds and sit for an hour, and that she has trouble concen-trating. Despite these reports, [she] said that she

29 - FINDINGS & RECOMMENDATION

still works 25 to 30 hours per week 'when she feels good
enough' as a cashier at a market." (A.R. 15; citations
to exhibits omitted).

- Although Maxwell was advised to continue with individual
therapy after she was discharged from treatment in late
2007 or early 2008, she "decided not to attend the day
treatment program," stating "she would have support
through her church." (A.R. 16)  In July 2008, she
"declined antidepressants." (*Id.*)

- On two occasions, once in early 2009, and again in early
2010, Maxwell stated her pain medications had gone
missing, and she sought early refills.  In October 2010,
she tested positive for THC.  She "denied smoking but
said her ex-husband may have laced some brownies." (A.R.
16-17)

- The State agency consulting physicians noted a lack of
objective findings in the Record to substantiate
Maxwell's claim of severe back pain.  (A.R. 17)

- The State agency consulting psychologists noted Maxwell's
lack of mental health counseling, and found Maxwell's
mental functional abilities did not support her claim
that she was disabled "as of December 31, 2007, the date
last insured." (*Id.*)

The ALJ gave the State agency consultants' opinions "significant
weight," finding them to be "well supported by medically acceptable
clinical and laboratory diagnostic techniques and . . . not
inconsistent with other substantial evidence in the case record."
(*Id.*)

     Because the ALJ found Maxwell able to work, he therefore found
Maxwell had not been disabled at any time from December 31, 2001,
through December 9, 2010, the date of his decision.  (A.R. 19)

### IV.  STANDARD OF REVIEW

     The court may set aside a denial of benefits only if the
Commissioner's findings are "'not supported by substantial evidence
or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.
Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.*

30 – FINDINGS & RECOMMENDATION

1    *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*

2    *v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1

3    (9th Cir. May 20, 2011).  Substantial evidence is '"more than a

4    mere scintilla but less than a preponderance; it is such relevant

5    evidence as a reasonable mind might accept as adequate to support

6    a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,

7    1039 (9th Cir. 1995)).

8         The court "cannot affirm the Commissioner's decision 'simply

9    by isolating a specific quantum of supporting evidence.'"  *Holohan*

10   *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*

11   *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court

12   must consider the entire record, weighing both the evidence that

13   supports the Commissioner's conclusions, and the evidence that

14   detracts from those conclusions.  *Id.*  However, if the evidence as

15   a whole can support more than one rational interpretation, the

16   ALJ's decision must be upheld; the court may not substitute its

17   judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v.*

18   *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

19

20                          ***V.  DISCUSSION***

21                   ***A.  Duty to Develop the Record***

22        Maxwell argues the ALJ failed in his duty to develop the

23   Record fully and fairly, and violated Maxwell's right to procedural

24   due process when he admitted exhibits into the Record subsequent to

25   the hearing without giving Maxwell an opportunity to object to or

26   comment on those exhibits.  Dkt. #14, pp. 6-7.  Addressing the

27   latter argument first, the court notes the ALJ sent Maxwell a

28   letter dated November 15, 2010, informing her of the additional

31 - FINDINGS & RECOMMENDATION

1   evidence he had secured and proposed entering into the Record, and

2   advising her of her right to make written comments, submit

3   additional records, submit written questions for the authors of the

4   new exhibits, or even request a supplemental hearing at which she

5   could question the authors of the records and call additional

6   witnesses.   (A.R. 216-17)   There is no evidence that Maxwell

7   exercised any of these rights with regard to the additional

8   exhibits.   The court finds the ALJ did not violate Maxwell's right

9   to procedural due process in admitting the post-hearing exhibits

10  into the Record.

11      Turning to Maxwell's argument that the ALJ failed to develop

12  the Record adequately, the parties agree with the general principle

13  that, "'[i]n Social Security cases, the ALJ has a special duty to

14  fully and fairly develop the record and to assure that the

15  claimant's interests are considered.'"   *Hayes v. Astrue*, 270 Fed.

16  Appx. 502, 504 (9th Cir. 2008) (unpublished) (quoting *Brown v.

17  Heckler*, 713 F.2d 441, 443 (9th Cir. 1983) (per curiam); *see* Dkt.

18  #14, p. 6; Dkt. #16, p. 4.   "This duty exists even when the

19  claimant is represented by counsel," and is heightened when a

20  claimant is unrepresented.   *Id.*   Fulfilling this duty may require

21  the ALJ to consult a medical expert or to obtain a consultative

22  examination.   *Loeks v. Astrue*, slip op., 2011 WL 198146, at *5 (D.

23  Or. Jan. 18, 2011) (Haggerty, J.) (citing 20 C.F.R. §§ 404.1519a &

24  416.919a).

25      "Relatedly, an ALJ must take reasonable steps to ensure that

26  issues and questions raised during the presentation of medical

27  evidence are addressed so that the disability determination is

28  fairly made on a sufficient record of information."   *Id.* (citing

32 - FINDINGS & RECOMMENDATION

1  *Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1999); 20 C.F.R.

2  §§ 404.1527(c)(3) & 416.927(c)(3) ("explaining how an ALJ may

3  obtain additional evidence where medical evidence is insufficient

4  to    determine    whether    claimant    is    disabled"); 20 C.F.R.

5  §§ 404.1512(e) and 416.912(e) ("obtaining additional information

6  from treating doctors")). However, if the record evidence is

7  unambiguous, and is sufficient to allow for proper evaluation, then

8  the duty to develop the record further is not triggered.  *Id.*

9  (citing *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001));

10 *Frampton v. Astrue*, slip op., 2010 WL 373867, at *13 (D. Or. Jan.

11 29, 2010) (Mosman, J.) (same).

12     Maxwell argues the ALJ picked out items in the documentary

13 evidence that were detrimental to her claim, and failed to develop

14 evidence supporting her claim.  As an example, she points to

15 Dr. Sims's October 12, 2009, treatment note indicating Maxwell has

16 "chronic pain prob[able] Fibromyalgia[.]"  (A.R. 305)  In July

17 2008, Dr. Sims indicated Maxwell's chronic low back pain had

18 resulted in "physical limitations . . . especially with lifting,

19 bending and prolonged standing and sitting."  (A.R. 293)  Maxwell

20 argues these statements should have prompted the ALJ to obtain "a

21 consultative examination to determine the degree of functional

22 limitation related to [her] pain and/or [her] fibromyalgia."  Dkt.

23 #14, p. 7.

24     The ALJ gave "significant weight" to the opinions of the non-

25 examining State agency consultants, rendered in April and September

26 2008, indicating Maxwell's chronic back pain was "nonsevere . . .

27 due to the lack of objective findings in the record."  (A.R. 17;

28 *see* A.R. 261, 294)  Regarding the medical evidence post-dating the

33 - FINDINGS & RECOMMENDATION

State agency consultants' opinions, including Dr. Sims's October
2009 treatment note, the ALJ noted the following:

> [A]fter discharge from drug and alcohol
> treatment, [Maxwell] was seen for back pain at
> [VGMHC]. Despite her recent drug treatment,
> she was given pain medications. She had
> reported limitations on bending, lifting, and
> prolonged standing. She also had "depression
> for which she has been recommended to undergo
> counseling sessions." . . .
>
> [She] returned to this clinic in May 2008 with
> chronic back pain and social stress. . . .
> Although the chart notes indicate her history
> of drug and alcohol treatment, she was given
> Ultram and Tramadol and told to follow up in a
> year. [Maxwell] called shortly thereafter
> stating that the Tramadol was not strong
> enough and was told that if she wanted some-
> thing else an appointment would be needed. In
> July 2008, [she] declined antidepressants and
> was offered counseling.
>
> In early 2009, [Maxwell] reported that her
> back pain varied in location and intensity day
> to day. She said her current medications were
> not helping much. She was assessed with
> chronic back pain with a likely somatic compo-
> nent and given Vicodin. She reported good
> pain control with Vicodin. . . . A March 2009
> spinal view showed mild lumbar degenerative
> changes[.]
>
> [Maxwell] returned in October 2009 with upper
> back pain and was becoming depressed about her
> pain issues. She was assessed with chronic
> pain, probable fibromyalgia, and depression
> secondary to the pain. She was on oxycodone
> by that point.
>
> In November 2009, [Maxwell] had a well woman
> exam and stated that she worked part-time at
> Peoples Market. She complained of low back
> pain and was given Cymbalta and oxycodone.
>
> A March 2010 MRI of the cervical spine showed
> some moderate narrowing of the left neural
> foramen at C3-4, some mild bony eburnation at
> C4-5 and C6-7, and a small tear in the
> posterior disc annulus at C6-7. [Maxwell]
> reported that her oxycodone had been stolen
> from her purse and was counseled that she had
> broken her pain contract and would not be

> given medication.  She was crying, stating
> that she needs her medication to work; she was
> doing a lot of lifting at the convenience
> store. . . .

(A.R. 16-17; citations to exhibits omitted).  Thus, the ALJ did, in fact, consider evidence that Maxwell suffers from chronic back pain.  He found, however, that Maxwell's ability to perform work at all exertional levels was not compromised by any physical limitations.  The ALJ's conclusion in this regard is supported by Maxwell's reported activities, including part-time work; by the lack of findings showing her back pain arose from any significant abnormality, injury, or other condition; and by her self-reports that with medication, she was able to work and function without limitations.  Further, one mention by a doctor that Maxwell might have fibromyalgia is not enough to trigger the ALJ's duty to obtain further examinations or testing.  Dr. Sims did not order further testing herself, or refer Maxwell to a specialist, and the doctor's notes do not indicate the presence of objective findings, or even the presence of "trigger points" or other subjective criteria, to support such a diagnosis.

Maxwell argues the State agency consultants' opinions cannot, standing alone, "'constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* treating physician.'"  Dkt. #14, p. 10 (quoting *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995)).  While a correct statement of law, this observation is irrelevant here, where there is no opinion from any of Maxwell's physicians - either in report form or even as a suggestion in the treatment notes - that Maxwell has disabling limitations that would prevent her from working.  Dr. Sims's letter

35 - FINDINGS & RECOMMENDATION

dated July 15, 2008, indicated Maxwell's chronic back pain has caused her "physical limitations . . . especially with lifting, bending and prolonged standing and sitting." (A.R. 293)  However, the doctor's letter appears to simply recite the limitations Maxwell had self-reported when she began treatment with Dr. Sims, and the doctor's treatment notes only indicate occasional findings of mild tenderness and muscle spasms in Maxwell's back.  Again, per Maxwell's own statements, with the help of her medications she is able to function adequately, including working at a job that requires "a lot of lifting." (A.R. 16-17)

The court finds the Record evidence was sufficient to allow for proper evaluation, and thus, the ALJ did not have a duty to develop the record further regarding Maxwell's back pain or possible fibromyalgia diagnosis.  While the Record contains evidence that Maxwell suffers from chronic back pain, the evidence does not support her claim that her back pain is disabling.  The Record contains substantial evidence to support the ALJ's determination that Maxwell does not have a physical impairment that would compromise her ability to work at any exertional level.

### B.  Residual Functional Capacity and Step Four Finding

Maxwell also argues at some length that the ALJ erred at step four in finding Maxwell is able to return to her past relevant work as an electronics assembler, both as Maxwell performed the job and as it is normally performed.  Dkt. #14, pp. 11-14.  As the ALJ noted, before considering, at step four of the sequential evaluation process, whether a claimant can return to her past relevant work, the ALJ first must determine the claimant's RFC. (A.R. 11,

36 - FINDINGS & RECOMMENDATION

1   citing 20 C.F.R. §§ 404.1520(e) & 416.920(e)).  Maxwell argues the

2   ALJ's RFC determination contains significant functional limitations

3   that are not defined in, and thus "conflict with," the *DOT*.  Dkt.

4   #14, pp. 12-19.  She argues the ALJ erred in failing to have the VE

5   discuss how the functional limitations identified in the ALJ's RFC

6   determination related to each of the jobs the VE identified.  She

7   therefore argues the ALJ erred in relying on the VE's testimony in

8   finding she is able to return to her past work as an electronics

9   assembler.

10      Maxwell isolates, for discussion, certain terms and phrases

11  contained in the ALJ's RFC determination as indicated by the

12  numbers in brackets, below:

> [Maxwell] has the residual functional capacity
> to perform a full range of work at all
> exertional levels but with the following non-
> exertional limitations: [she] can understand
> and remember simple, routine instructions and
> procedures, **[1]** can sustain concentration and
> attention to complete simple, routine tasks
> consistently, can sustain limited interaction
> with the general public, **[2]** can interact in a
> structured setting **[3]** that does not require
> quick problem-solving, **[4]** needs a routine
> work setting that does not change rapidly, and
> **[5]** should avoid hazards and heights due to
> drug use.

21  (A.R. 14; *see* Dkt. #14, pp. 12-18).

22      Regarding phrase **[1]**, Maxwell asserts the *DOT* does not address

23  the terms "sustain" or "consistently," as related to an indi-

24  vidual's "ability to maintain attention and concentration," instead

25  addressing "the ability to perform tasks on an occasional, frequent

26  or constant basis."  Dkt. #14, p. 16 & n.7 (citing *DOT* App. C

27  p. 1013 (4th ed. 1991)).  She argues the ALJ's use of the terms

28  "sustain" and "consistently," rather than the accepted designation

37 - FINDINGS & RECOMMENDATION

of "occasional, frequent or constant," is in conflict with the *DOT*, and the "conflict . . . is not explained." *Id.* Regarding phrases **[3]** and **[4]**, Maxwell similarly argues the *DOT* does not address the speed or quickness of problem-solving required for a job, or whether a work setting is "routine" or changes "rapidly." *Id.*, p. 17. She further argues the ALJ's indication that she could "interact in a structured setting" (phrase **[2]**) required exploration with the VE because a structured setting often refers to "sheltered work shops." *Id.* She argues the ALJ erred in failing to have the VE explain how the jobs he identified met all of these criteria that differ from the terminology used in the *DOT*. *Id.*, pp. 15-17.

An ALJ is not permitted to rely on a VE's testimony regarding jobs an individual can perform "without first inquiring whether the testimony conflicts with the *DOT*." *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) (citing, *inter alia*, SSR 00-4P, *available at* 2000 WL 1898704, and cases from the Third, Seventh, and Tenth Circuits). Here, the ALJ asked the VE to point out "any differences of opinion [the VE had] on the way jobs are performed in [the VE's] experience versus the way they're described in the *DOT*." (A.R. 41)

The VE identified and discussed such a variation from the *DOT* with regard to the SVP of the electronics assembler job. The *DOT* assigns the electronics assembler job an SVP of 4. Under the *DOT* definition, a person with level 4 reasoning development will have the ability to "[a]pply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists[,]" and

38 – FINDINGS & RECOMMENDATION

"[i]nterpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form. (Examples of rational systems include: bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation.)." *DOT*, App. C, § III. As one court has observed, "The Ninth Circuit has not determined whether an RFC limiting an individual to 'simple' jobs is inconsistent with a position involving Level 3 or higher DOT reasoning capacity." *VonBeuelow v. Astrue*, 2013 WL 990414, at *2 (C.D. Cal. Mar. 12, 2013). The ALJ's limitations to "simple, routine instructions and procedures," and "simple, routine tasks" would appear to be inconsistent with the *DOT*'s description of level 4 reasoning. However, the VE testified that more recent publica-tions from the U.S. Department of Labor and the Oregon Employment Department indicate the electronics assembler job, "as actually performed," requires only level 2 reasoning. (*See* A.R. 17, 44) "[A] claimant who is limited to 'simple, routine tasks and instruc-tions' is capable of performing a job requiring Level Two reason-ing." *Patton v. Astrue*, slip op., 2013 WL 705909, at *1 (D. Or. Feb. 25, 2013) (Brown, J.); *see Abew v. Astrue*, 303 Fed. Appx. 567, 569 (9th Cir. 2008) (unpublished) (finding no conflict between ALJ's RFC determination that claimant could perform "only simple tasks" and VE's testimony that he could do jobs with SVP2). There-fore, the ALJ's reliance on the VE's testimony that Maxwell can perform a job with an SVP of 2 is supported by substantial evidence.

Although the VE did not identify other inconsistencies between the *DOT* and the ALJ's RFC findings, the court finds the "incon-sistencies" identified by Maxwell are not the types of deviations

39 - FINDINGS & RECOMMENDATION

about which the ALJ had a duty to inquire.  The RFC determination uses clear, ordinary words that are easily understood.  *Cf. McCutcheon v. Astrue*, 378 Fed. Appx. 649, 651 (9th Cir. 2010) (unpublished) (the court "can draw 'specific and legitimate inferences from the ALJ's opinion'") (quoting *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989)).  The VE gave no indication that he did not understand the ALJ's use of these common terms.  ALJs regularly use terms such as "sustain," "routine," and "consistently" in their RFC determinations.  *See, e.g.* (all emphases added), *Fern v. Colvin*, slip op., 2013 WL 1326605, at *2 (D. Or. Mar. 28, 2013) (claimant "could perform **routine**, repetitive tasks with simple instructions"); *Berreth v. Colvin*, slip op., 2013 WL 1294712, at *2 (D. Or. Mar. 26, 2013) (claimant was "limited to simple, **routine** tasks"); *Horton v. Comm'r, SSA*, slip op., 2013 WL 1183308, at *2 (D. Or. Mar. 21, 2013) (claimant "could perform simple, **routine**, repetitive tasks"); *Hudson v. Astrue*, slip op., 2013 WL 474799, at *7 (D. Or. Jan. 7, 2013) ("the RFC is by definition an assessment of a claimant's ability to **sustain** full time work activity"); *Boone v. Comm'r, SSA*, 2013 WL 1942157, at *1 (D. Md. May 8, 2013) (claimant "should be afforded the opportunity to sit for 30 minutes and stand for 30 minutes **consistently**").  The regulations, themselves, refer to "structured settings" without further explanation, indicating a claimant's degree of functional limitation will be determined by considering, *inter alia*, "chronic mental disorders, **structured settings**, medication and other treatment."  20 C.F.R. §§ 404.1520a(c) & 416.920a(c) (emphasis added).

The court finds the ALJ did not err in failing to have the VE discuss how the jobs the VE identified matched up with the specific

40 - FINDINGS & RECOMMENDATION

terminology used by the ALJ in his RFC determination.   The court
further finds substantial evidence supports the ALJ's determination
that Maxwell could return to her past relevant work as an
electronics assembler.

### C.  Step Five Findings

Maxwell further argues the ALJ erred in finding she can
perform "other jobs that exist in significant numbers in the
national economy." (A.R. 18)  In particular, Maxwell argues the
three jobs identified by the ALJ involve "hazards" that would make
them inconsistent with phrase **[5]** that she identified in the ALJ's
RFC determination (i.e., that she "should avoid hazards and heights
due to drug use"). Dkt. #14, pp. 18-19.  The Commissioner argues
the ALJ's step five findings were "immaterial," and only "an
alternative, discretionary undertaking," because the ALJ correctly
determined Maxwell could return to her past relevant work.  Dkt.
#16, p. 11.

The Commissioner is correct.  Having found Maxwell is able to
return to her past relevant work, the burden of proof never shifted
to the Commissioner, and no further analysis was required.  A
claimant who can still perform past relevant work is not disabled.
20 C.F.R. §§ 404.1520(f) & 416.920(f).

### VI.  CONCLUSION

Substantial evidence supports the ALJ's decision that Maxwell
is not disabled.  The undersigned therefore recommends the Commis-
sioner's decision be affirmed.

41 - FINDINGS & RECOMMENDATION

***VII.   SCHEDULING ORDER***

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due by **August 5, 2013**. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.   If objections are filed, then any response is due by **August 22, 2013**.   By the earlier of the response due date or the date a response is filed, the Findings and Recommendations will go under advisement.

IT IS SO ORDERED.

Dated this <u>16th</u> day of July, 2013.


<u>/s/ Dennis James Hubel</u>
Dennis James Hubel
Unites States Magistrate Judge